Ivel PALMITER, Plaintiff,

v.

ACTION, INC., Defendant,

Richard S. Schweiker, Secretary of Health and Human Services, and State of Indiana ex rel. Indiana Office of Community Services Administration, Defendants-Intervenors.

No. S 82–119.

United States District Court,
N.D. Indiana,
South Bend Division.

Oct. 8, 1982.

James F. Groves, Robert Canfield, South Bend, Ind., for plaintiff.

Don Blackmond, South Bend, Ind., Linley E. Pearson, Atty. Gen. of Ind., Indianapolis, Ind., for defendant.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

This case is presently before the Court for final disposition on a post-judgment garnishment proceeding. An evidentiary hearing was held in this matter on August 6, 1982, after which the parties submitted their final written arguments. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this memorandum and order constitutes this Court's findings of fact and conclusions of law.

This case arises out of a tort action originally brought in the St. Joseph Circuit Court for damages based on plaintiff's, Ivel Palmiter, personal injuries sustained in an accident involving an employee of defendant, Action, Inc. (Action), a non-profit community service organization funded almost exclusively by federal and state grants. In December 1981, a jury awarded the plaintiff $209,000.00 in damages. Thereafter, in March 1982 the plaintiff filed proceedings supplemental in state court against garnishee-defendant, St. Joseph Bank and Trust Company of South Bend (Bank), seeking to attach Action's several accounts with the Bank in order to satisfy the underlying judgment.

Acting pursuant to 28 U.S.C. §§ 1442(a), 1446(e), the United States of America filed a petition to remove the civil action garnishment proceedings to this court on March 30, 1982, alleging that the monies held by the Bank on Action's behalf belonged to the federal government and were therefore immune from attachment. On April 5, 1982, Richard S. Schweiker, Secretary of the United States Department of Health and Human Services, moved to intervene in this cause of action. On April 30, 1982, the State of Indiana, acting *ex relatione* the Indiana Office of Community Services Administration (IOCSA) also moved to intervene.[1] On May 6, 1982, at

---

1. The IOCSA was abolished on June 30, 1982. Ind.Code Ann. § 4–26–3–16 (Burns 1982). Immediately thereafter, on July 1, 1982, the Indiana Department of Aging and Community

the conclusion of a hearing on all pending motions, this Court assumed jurisdiction of the matter and granted both parties' motions to intervene. On May 28, 1982, this Court entered a restraining order to prevent Action from disposing of, secreting, or encumbering any assets involved in the action, said restraining order to remain in effect until further order of the Court.

In order to determine whether the plaintiff can satisfy its state court judgment out of Action's frozen bank accounts, this Court must first decide to whom those funds belong. If those monies are in fact Action's property, there should be no bar to plaintiff's levying thereon. See, *e.g.*, defendant-intervenor (IOCSA's) (now IDACS) prehearing brief, page 5. On the other hand, if Action's role in distributing federal and state grants to the local community was merely that of a conduit, those assets would retain their character as government funds and, under the doctrine of sovereign immunity, would be immune from attachment. For the reasons which follow, this Court concludes that Action's frozen bank accounts are in fact the property of the federal government and are therefore not subject to attachment by the plaintiff.

Organizations like Action are only one link in the bureaucratic chain necessary to move funds from the United States Treasury to local communities. As a rule such local, community-service associations are the recipients of both direct federal grants, i.e., monies transferred directly from a federal department or agency to the local group, and indirect federal grants, *e.g.*, block grants from the federal government to the individual states who in turn allocate said grants among various local organizations like Action. The defendant Action was substantially funded by both direct and indirect federal grants.

A careful review of the record shows that the State of Indiana received federal funds from the United States Department of Health and Human Services as well as the Department of Energy to provide support for programs established under the Omnibus Budget Reconciliation Act of 1981, P.L. 97–35, §§ 671 et seq., codified at 42 U.S.C. § 9901, and the Energy Conservation and Production Act, P.L. 94–385, codified at 42 U.S.C. § 6851 et seq. The State of Indiana, through the defendant-intervenor IOCSA (now IDACS), then contracted with local community-service organizations, including defendant, Action, which were in turn to administer those indirect federal grants at the local level under the guidelines established by the terms of their respective contracts.

In addition to the indirect federal grants noted above, defendant, Action, also received various direct federal grants. Specifically, these include a grant from the Administration for Children, Youth and Families, a unit of the Office of Human Department Services, United States Department of Health and Human Services, in the total amount of $1,026,013.00 for the budgetary period beginning November 1, 1981 and ending October 31, 1982. This grant was to provide the necessary funding for the local Headstart Program, a project designed to serve some 600 area preschool children with classroom activities and hot meals, established pursuant to the Headstart Program codified at 42 U.S.C. § 9831 et seq. Additionally, the former Community Services Administration awarded Action three direct grants in the respective amounts of $401,000.00 (administration and community programs), $104,000.00 (energy crisis assistance), and $15,547.00 (community education), under the Economic Opportunity Act of 1964 as amended by the Headstart, Economic Opportunity, and Commu-

Services (IDACS) was established. Ind.Code Ann. § 4–27–1–1 et seq. (Burns 1982).

Indiana Code Section 4–27–4–3(a) states:
On July 1, 1982, all powers, duties and liabilities of the office of community services administration are transferred to the depart-

ment on aging and community services, as the successor agency.

Thus, IDACS now performs those functions formerly performed by IOCSA. The change in IOCSA's name therefore has no significant effect in this action.

nity Partnership Act of 1974, 42 U.S.C. §§ 2808(a) and 2809(a)(5) (since repealed). Although these last three grants were for budgeting periods ending prior to January 1, 1982, two were extended to June 30 and August 30, 1982, and none of the three were closed out as of March 1982. With the exception of the community education grant in the amount of $15,547.00, which was paid by check, the method of payment for the $1,026,013.00, $401,000.00 and $104,-000.00 grants was by letter of credit.

By agreement of the parties, the accounting firm of Peat, Marwick, Mitchell and Company (Peat Marwick) performed an audit of Action's financial records for the period ending May 31, 1982. Peat Marwick's report, dated June 29, 1982, and submitted as defendant-intervenor State of Indiana's exhibit "K" on July 19, 1982, reveals that substantially all of the funds held by garnishee-defendant Bank on behalf of Action are of federal government origin, i.e., direct or indirect federal grants. See Peat Marwick's Financial Statements and Schedules, Schedules 3 and 4. The conclusion that virtually all of Action's funding came, directly or indirectly, from the United States Government is corroborated by the testimony of Pam Thompson, representative of Peat Marwick; Elliott Harris, executive director of Action, and Donald Hix, also employed by Action. Because the plaintiff does not seriously contest the ultimate source of these monies (although strenuously arguing that such funds were paid to Action on a state-reimbursement basis and are therefore, Action's property), this Court concludes that substantially all of the assets held in the 12 bank accounts in Action's name by garnishee-defendant Bank are grants from the federal government.

All funds which originated as indirect federal grants, i.e., block grants from the federal government to the individual states, and which are presently on deposit in Action's accounts, fall under various Congressional authorizations: the Omnibus Budget Reconciliation Act of 1981, P.L. 97–35, §§ 671 et seq. since codified at 42 U.S.C. §§ 9901 et seq. (Community Services Block Grant program); and the Energy Conservation and Production Act, P.L. 94–385, 42 U.S.C. § 6851 et seq. (the "Weatherization" program). Indiana law governing these indirect grants provides, in relevant part:

> If any federal funds be received by the state pursuant to the provisions of any such federal law [relating to Grants-in-Aid], the same are hereby appropriated for the uses and purposes provided by said federal law, if such appropriations be required.

Ind.Code Ann. § 5–19–1–3.5 (Burns 1974). Thus, under Indiana law the funds received by IOCSA (now IDACS) and now on deposit in Action's accounts with the garnishee-defendant Bank are appropriated exclusively for the purposes provided in the original federal grants as set forth at 42 U.S.C. § 9904(c)(1):

> (c) As part of the annual application required by subsection (a) of this section, the chief executive officer of each State shall certify that the State agrees to—
>
> (1) use the funds available under this chapter—
>
> (A) to provide a range of services and activities having a measurable and potentially major impact on causes of poverty in the community or those areas of the community where poverty is a particularly acute problem;
>
> (B) to provide activities designed to assist low-income participants including the elderly poor—
>
> (i) to secure and retain meaningful employment;
>
> (ii) to attain an adequate education;
>
> (iii) to make better use of available income;
>
> (iv) to obtain and maintain adequate housing and a suitable living environment;
>
> (v) to obtain emergency assistance through loans or grants to meet immediate and urgent individual and family needs, including the need for health services, nutritious food, housing, and employment-related assistance;

(vi) to remove obstacles and solve problems which block the achievement of self-sufficiency;

(vii) to achieve greater participation in the affairs of the community; and

(viii) to make more effective use of other programs related to the purposes of this chapter;

(C) to provide on an emergency basis for the provisions of such supplies and services, nutritious foodstuffs, and related services, as may be necessary to counteract conditions of starvation and malnutrition among the poor;

(D) to coordinate and establish linkages between governmental and other social services programs to assure the effective delivery of such services to low-income individuals; and

(E) to encourage the use of entities in the private sector of the community in efforts to ameliorate poverty in the community;

As for those funds held in Action's accounts which originated in direct federal grants, they all fall under either the Headstart Program, 42 U.S.C. § 9831 et seq., 45 C.F.R. Parts 1301–1304; the Energy Crisis Intervention Program, 42 U.S.C. § 2809(a)(5), 45 C.F.R. Subparts 1061.30, 1061.31, 1061.51, and Parts 1067–69, 1060 and 1050; or the Community Action Program, 42 U.S.C. § 2808(a), 45 C.F.R. Parts 1067–69, 1060 and 1050. As with indirect grants these direct federal grants come "with strings attached,", i.e., with specific statutory purposes for which the Congressional appropriations are to be used. See, e.g., 42 U.S.C. §§ 2808(a), 2809(a)(5).

Because the ultimate source of these funds is the United States Government, and the conditions under which they are to be received and the purposes for which they are to be disbursed are spelled out by Congress, this Court must determine whether grants so earmarked by Congress may be attached by a state court judgment creditor.

■ It is axiomatic that federal monies are protected from garnishment proceedings until paid out for the purposes indicated by the federal government. *Buchanan v. Alexander,* 4 How. (45 U.S.) 20, 11 L.Ed. 857 (1846). Further a federal agency is not subject to process in a state court garnishment proceeding absent consent to suit on the part of the United States. *Clarise Sportswear Co. v. U. & W. Mfg. Co.,* 223 F.Supp. 961 (E.D.Pa.1963). Although it is clear that Action is not a federal agency, it is equally clear that virtually all of Action's funding is ultimately derived from the federal government; as a result, the language of *Henry v. First National Bank of Clarksdale,* 424 F.Supp. 633 (N.D.Miss.1976), aff'd, 595 F.2d 291 (5th Cir. 1979), reh. den., 601 F.2d 586, *cert. den., sub. nom. Claiborne Hardware Co. v. Henry,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), concerning the interest of the United States in such funds, is controlling. In that case, the United States sought in federal court to enjoin a state court's attachment of federal grant monies received by a local, non-profit, community-service organization. The district court held:

The Head Start Act and regulations promulgated pursuant thereto, provide that title to all property purchased with grant funds is vested in the grantee solely for the purpose of enabling the grantee to carry out the objective of the grant, i.e., operate a Head Start Program as authorized by the Head Start Act, 42 USC § 2291, et seq. The United States has a full and complete lien interest in all funds and property purchased by MAP with funds advanced by HEW. *In order to protect the interest of the United States in these funds and property, it is necessary to enjoin defendants from subjecting, in any way, such funds and property to the satisfaction of the state court's monetary awards.* The objective of the Head Start Program would be curtailed, if not eliminated, if such injunctive relief is not granted.

The courts have long recognized and enforced the rule that no property interest of the United States can be subjected to judicial process without the consent of the sovereign. *United States v. Ala-*

*bama,* 313 U.S. 274, 281, 61 S.Ct. 1011 [1013], 85 L.Ed. 1327 (1941), *Maricopa County v. Valley National Bank,* 318 U.S. 357, 362, 63 S.Ct. 587 [589], 87 L.Ed. 834 (1943).

The United States is now threatened with immediate, irreparable harm as the result of pending enforcement of the state judgment against MAP. The court concludes that injunctive relief is appropriate.

424 F.Supp. at 637 (emphasis added).

On appeal, the Court of Appeals held that the federal government retains an equitable, reversionary interest in federal grant monies given to private, non-profit organizations. At pages 308–9 of that opinion, the Court of Appeals in *Henry* held:

The only question, therefore, is whether the United States had a property interest in MAP's funds and property sufficient to invoke the above principle. The United States claimed an equitable lien in such funds and property. We find that the district court did not abuse its discretion in deciding that the United States was likely to succeed in its claim that it had an equitable interest in MAP's property and that this interest could not be subjected to state judicial process without the consent of the United States.

It is undisputed that virtually all of MAP's assets derive from grants made through the Department of Health, Education and Welfare under the Headstart-Follow Through Act, 42 U.S.C. § 2928, et seq. (1976), and predecessor statutes authorizing funding for qualified Headstart Programs. The Act carefully delineates the purposes for which grant funds may be expended. Although MAP is a private, nonprofit corporation and not a federal agency, extensive and detailed regulations govern its expenditure of federal funds in order to ensure the use of grant funds for approved purposes. *See* 45 C.F.R. Part 74 (1977). The United States retains a reversionary interest in all grant funds and in all property purchased with such funds that can no longer be used for the narrow purposes specified in the Act and regulations. *Id.* A Head-start grantee must undergo an annual audit to determine whether it has spent grant funds in a fashion consistent with "applicable laws, regulations and directives". 45 C.F.R. § 1301.3–3(a).

The district court could properly conclude that the United States' continuing interest in grant funds met the criteria for creation of an equitable lien. *See Avco Delta Corp. Canada Ltd. v. United States,* 7 Cir., 1973, 484 F.2d 692, 702, *cert. denied sub nom. Canadian Parkhill Pipe Stringing, Ltd. v. United States,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); *Citizens Co-Op Gin v. United States,* 5 Cir., 1970, 427 F.2d 692, 695; *Morrison Flying Service v. Deming National Bank,* 10 Cir., 1968, 404 F.2d 856, 861, *cert. denied,* 393 U.S. 1020, 89 S.Ct. 628, 21 L.Ed.2d 565 (1969). The equitable as well as the legal property interests of the United States enjoy immunity from unconsented judicial process. *See Blake Construction Co. v. American Vocational Assoc., Inc.,* 1969, 136 U.S.App.D.C. 6, 419 F.2d 308, and cases cited.

Therefore, based on the above, it seems clear that, absent consent to suit on the part of the sovereign United States, the funds which form the subject matter of this cause of action are immune from attachment by a judgment creditor.

A careful review of the record reveals no consent to suit on the part of the United States. Further, this Court's research has uncovered only one exception to the rule of protection of federal funds from garnishment proceedings, viz, attachment of federal monies paid an individual as compensation for services rendered is permitted where such individual has arrearages in alimony or child support. 42 U.S.C. § 659. The facts of this action do not meet the criteria of 42 U.S.C. § 659.

Plaintiff argues that, notwithstanding the fact that virtually all of the assets held by Action in its 12 accounts with garnishee-defendant Bank may be of federal origin, Action's commingling of those funds, from whatever source, by transfers among the various accounts at the Bank places the

*onus probandi* on the defendant-intervenors to identify those funds which are immune from attachment.

As noted above, substantially all of the monies held in Action's 12 accounts are ultimately of federal origin. Thus, transfers to accounts funded by direct federal grants from accounts funded by indirect federal grants and *vice versa,* while perhaps not in accordance with generally accepted accounting procedures, are nonetheless irrelevant insofar as identifying the ultimate source of those funds is concerned. Further, the commingling of those funds does not in and of itself destroy their identities as property immune from attachment. Rather, the equitable lien existing on those funds in favor of the United States gives rise to, in effect, a trust relationship between the federal government and Action.

Equity follows trust assets, and will take them out of an indistinguishable mass for restitution to the beneficiary of the trust. *Central National Bank v. Connecticut Mutual Life Insurance Co.,* 104 U.S. 54, 63, 26 L.Ed. 693 (1881); *Cunningham v. Brown,* 265 U.S. 1, 12, 44 S.Ct. 424, 426, 68 L.Ed. 873 (1924); see also, *In re Teltronics, Ltd.,* 649 F.2d 1236, 1241 (7th Cir. 1981). Thus, defendant-intervenor United States need only trace those trust funds into an identifiable mass of commingled funds, *Central National Bank, supra,* and Action's 12 accounts with the garnishee-defendant Bank so constitute such a specific mass of funds. Since the burden of proof in proceedings supplemental is on the judgment creditor to show affirmatively that the property to be attached is subject to execution, *Hopple v. Star City Elevator Co.,* 140 Ind.App. 561, 224 N.E.2d 321 (1967), and "[p]roperty should remain in the hands of its rightful owners, no matter how legitimate the claims of creditors," *Teltronics, supra,* at 1239, this Court concludes that the plaintiff has failed to sustain its burden of proof and the funds on deposit in Action's accounts with the garnishee-defendant Bank are therefore not subject to attachment by the plaintiff.

Finally, the underlying facts in this case make all too clear the significance of the maxim, "Hard cases make bad law." Were the plaintiff here able to reach those funds which Congress has set aside for specific and laudable goals in order to satisfy a personal, state court judgment, the ability of various local community-service projects to continue operations would not only be impaired, but all such organizations' futures would be threatened by the establishment of such a precedent. Further, the willingness of our legislative assemblies to continue to take an active part in attempting to redress the imbalances which exist in our society might be seriously undercut by a holding that federal grants could be attached to satisfy a state court judgment once those federal funds are turned over to nongovernmental organizations.

For the above-stated reasons, this Court now finds that the plaintiff, Ivel Palmiter, is not entitled to the funds which form the subject matter of this cause of action. Therefore, this case is hereby DISMISSED, and the restraining order entered May 28, 1982 against defendant Action is hereby VACATED. Each party will bear its own costs.

SO ORDERED.