733 F.2d 1244
 Ivel PALMITER, Plaintiff-Appellant,
v.
ACTION, INC., Defendant-Appellee,
and
Richard S. Schweiker, Secretary of Health and Human
Services, and State of Indiana ex rel. Indiana
Office of Community Services
Administration, Intervening
Defendants-Appellees.
 No. 82-2708.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 2, 1983.
Decided May 9, 1984.
 
 James F. Groves, Lee, Groves & Cotter, South Bend, Ind., for plaintiff-appellant.
 Barbara J. Marvel, Deputy Atty. Gen., Indianapolis, Ind., James R. Goeser, Asst. Regional Atty., Dept. of Health & Human Services, Chicago, Ill., for defendant-appellee.
 Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and MAROVITZ, Senior District Judge.*
 CUMMINGS, Chief Judge.
 
 
 1
 This is an appeal from an order of the United States District Court for the Northern District of Indiana dismissing Ivel Palmiter's post-judgment garnishment proceeding against Action, Inc., an Indiana non-profit community service organization substantially funded by direct and indirect federal grants.[1] Originally Palmiter maintained an Indiana state court personal injury suit against Action after his leg was crushed by a car driven by an Action employee. Because Palmiter recovered only a small part of his $209,000 judgment award from the employee's insurance company, he initiated the garnishment proceeding in Indiana state court seeking to attach twelve Action bank accounts.[2] Pursuant to 28 U.S.C. Secs. 1442(a)(1) and 1446(e), the United States, although not named by Palmiter as a party, filed a petition for removal to the district court, alleging that it was the real party in interest to the extent that the proceedings were "directed at garnishing, attaching or freezing the federal Headstart funds" in Action's bank accounts (Pet. for Removal p 5). Subsequently, District Judge Allen Sharp granted the separate motions of the Secretary of the United States Department of Health and Human Services ("HHS") and of the State of Indiana ex rel. the Indiana Office of Community Services Administration ("IOCSA")[3] to intervene as a matter of right pursuant to Fed.R.Civ.P. 24(a). After a hearing on the merits, Judge Sharp dismissed Palmiter's claim because substantially all the funds which Palmiter sought to attach were the property of the federal government and therefore immune from garnishment or attachment. 548 F.Supp. 1166. Judge Sharp also determined that because all the funds were federal, it was irrelevant to the result that Action had commingled its direct and indirect federal grant monies. The United States held an equitable lien on all the funds, since both types of grants were conditioned on the use of the funds for specific statutorily-mandated purposes. This lien gave rise to a trust relationship between Action and the federal government. Any burden on the federal government as lienholder to identify or trace its funds was satisfied because it had "trace[d] those trust funds into an identifiable mass of commingled funds * * * and Action's 12 accounts with the garnishee-defendant Bank so constitute such a specific mass of funds." Id. at 1172. Furthermore, the court noted that Palmiter had not met his burden as a judgment creditor under Indiana law to show affirmatively that the bank accounts he sought to garnish were subject to execution. Id.
 
 
 2
 On appeal, Palmiter does not challenge the district court's finding that virtually all the funds in Action's bank accounts were federal funds. He also concedes that the $21,074.04 general fund account (supra note 2) which has been identified as containing only federal direct grant Headstart funds is immune from attachment (Br. 12).
 
 
 3
 With regard to the $193,957.96 in Action's remaining frozen accounts (see supra note 2), Palmiter raises several claims, but they are reducible to only two significant arguments supporting his position that he may attach them. First, he insists that despite their federal origins the funds are now Action's property because Action received them from Indiana pursuant to reimbursement contracts. Second, he continues to raise his district court argument that even if these remaining accounts contain direct grant money, the United States cannot maintain an equitable lien for these funds, because it has failed to meet the burden imposed on the holder of such a lien to identify the specific dollars in the commingled accounts which were received by Action under direct grant programs or owed by Action to those programs.
 
 
 4
 * A
 
 
 5
 It is well settled that federal monies are not subject to garnishment proceedings until they have been paid out for the purposes for which they were appropriated. In Buchanan v. Alexander, 45 U.S. (4 How.) 20, 11 L.Ed. 857, the Supreme Court explained its rationale and stated the rule:
 
 
 6
 The funds of the government are specifically appropriated to certain national objects, and if such appropriations may be diverted and defeated by State process or otherwise, the functions of the government may be suspended. So long as money remains in the hands of a disbursing officer, it is as much the money of the United States as if it had not been drawn from the treasury. Until paid over by the agency of the government to the person entitled to it, the fund cannot, in any legal sense, be considered a part of his effects.
 
 
 7
 45 U.S. at 20-21. While it is true that Action is not a federal agency, any contention that this in itself makes the funds in Action's accounts garnishable is meritless.
 
 
 8
 As the district court noted, Action is "only one link in the bureaucratic chain necessary to move funds from the United States Treasury to local communities" pursuant to the intricate grant system developed by Congress. 548 F.Supp. at 1168. Even though Action is not a federal agency, its management of the federal funds it received nevertheless was governed by pervasive federal legislation and regulations which specified the purposes for which the funds could be used. For instance, its authority to make expenditures under the direct grant program was delineated under Congressional legislation and regulations of the Headstart Program (42 U.S.C. Secs. 9831-9852; 45 C.F.R. Secs. 1301-1305), the Energy Crisis Intervention Program (42 U.S.C. Sec. 2809(a)(5), repealed by 95 Stat. 519; 45 C.F.R. Subparts 1061.30, 1061.31, 1061.51 and Parts 1050, 1060, 1067-1069), and the Community Action Program (42 U.S.C. Sec. 2808(a), repealed by 95 Stat. 519; 45 C.F.R. Parts 1050, 1060, 1067-1069). Similarly, Action's authority to make expenditures under its indirect grant programs was spelled out under the federal legislation establishing the Community Services Block Grant program (42 U.S.C. Secs. 9901-9912) and the Energy Conservation and Production Act (42 U.S.C. Secs. 6851-6892).[4]
 
 
 9
 This pervasive federal supervision of Action's expenditures of grant funds makes Action similar to the Mississippi Action for Progress ("MAP"), a Mississippi non-profit organization which received federal funds under the Headstart Program. The Fifth Circuit refused to allow the garnishment of funds in MAP bank accounts to satisfy a state court judgment, deciding that the United States had an equitable, reversionary interest in those funds, at least to the extent that the funds were not paid out "for the narrow purposes specified in the Act and regulations." Henry v. First National Bank of Clarksdale, 595 F.2d 291, 309 (5th Cir.1979), certiorari denied sub nom. Claiborne Hardware Co. v. Henry, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756. Even where the organization disbursing federal grant funds is not a governmental agency, the principle long ago established in Buchanan applies to prevent garnishment of federal funds not yet "paid over * * * to the person entitled to it." Buchanan v. Alexander, supra, 45 U.S. at 21; see also Johnson v. Johnson, 332 F.Supp. 510 (E.D.Pa.1971). Consequently, the Action funds which Palmiter seeks to garnish are immune to the extent they have not yet been spent for their federally authorized purpose.
 
 B
 
 10
 Palmiter suggests that Buchanan and Henry apply only to prevent his garnishment of the $21,074.04 General Account which contained only Headstart monies. However, it is clear that the Buchanan-Henry principle prevents his satisfying his state court judgment by garnishing any Action funds of federal origin not yet expended for their statutorily-authorized purpose. As judgment creditor, Palmiter had the burden of proving which funds are either not federal or have been finally expended for their statutory purpose. Hopple v. Star City Elevator Co., 140 Ind.App. 561, 224 N.E.2d 321 (1967); see also In re Teltronics, Ltd., 649 F.2d 1236, 1241 (7th Cir.1981). Palmiter has not met his burden as to either of these prongs.
 
 
 11
 Palmiter claims that the Buchanan-Henry rule does not prevent garnishment of federal funds Action received pursuant to indirect grants administered by the state of Indiana because Action's contract with the state agency specified that Action would receive the funds only in reimbursement for funds actually spent for authorized grant purposes.[5] Because under the indirect grant contracts Action was to make expenditures before receiving the grant funds for those expenditures, Palmiter says that the money Action received from the state replaced funds Action previously spent and therefore was being "paid over * * * to [Action as] the person [finally] entitled to it" under Buchanan. He claims that the reimbursement funds "lost their public character" when deposited in Action's accounts and, because the federal government no longer had any legal or equitable interest in it, that money was properly garnishable by Palmiter (Br. 14).
 
 
 12
 This theory simply is not supported by the record. First, although Palmiter speculates that Indiana would not have paid Action absent proof of actual expenditures, it is undisputed that not all state payments to Action were actually made on a reimbursement-only basis.[6] Action's Executive Director testified that on at least some occasions he had submitted reimbursement vouchers to the state before Action had made the parallel expenditures (Tr. 27). The Executive Director of the state agency which supervised Action's indirect federal grants testified that after Palmiter began the garnishment proceedings which resulted in freezing Action's twelve bank accounts, the state learned that it had actually paid Action for at least $200,000 in expenses which Action had not paid at the time it submitted its reimbursement vouchers or even after it received the funds (Tr. 44-46; Palmiter Br. 10-11).
 
 
 13
 These indirect grant funds which Action received prior to making grant expenditures must be treated identically to the direct grant funds (like the $21,074.04 in Headstart funds which Palmiter concedes he may not attach) which it also received prior to expenditures. Under Buchanan and Henry these funds are not Action's but must be paid out for grant purposes or, if it is no longer possible to use the funds for grant purposes, they are subject to the United States' equitable reversionary interest. Henry, supra, 595 F.2d at 308-309.
 
 
 14
 Second, to the extent that Action has received funds in reimbursement for actual indirect grant expenditures, these also are immune from garnishment because the record indicates that Action had no funds of its own, i.e., funds whose source was not government grants (548 F.Supp. at 1169), and that indirect grant expenditures which Action made prior to receiving reimbursement funds were federal monies "borrowed" by Action from its direct grant accounts. Any reimbursement funds which Action obtained as a result of these expenditures were required to be returned to the direct grant accounts to be used for authorized direct grant purposes. Under Buchanan and Henry, the federal government retains an equitable interest in these funds and they are not available to satisfy Palmiter's state court judgment.
 
 
 15
 While it is not clear what indirect grant funds were received by Action as reimbursement for actual expenditures, it is clear that substantial assets held by Action in the accounts Palmiter sought to garnish were "borrowed" from direct grant funds which Action was authorized to "draw down," pursuant to letters of credit, in advance of direct grant expenditures (Tr. 51). These "drawn down" funds were transferred on a regular basis to indirect grant programs to provide otherwise unavailable working capital (Tr. 51, 75). For instance, Action's HHS auditor calculated and an independent audit confirmed that at the time Action's bank accounts were frozen, Action had received $137,159 in Headstart direct grant funds which Action had not used for Headstart purposes (Tr. 53; Gov't Exh. 1, Schedule 4 at 2 (Accounts Payable due to Non-Agency Funds)). Furthermore, the independent audit located another $256,000 in accounts payable attributable to Action's transfers of funds among the 12 accounts at issue here (Tr. 68-69; Gov't Exh. 1, Schedule 4 (Accounts Payable due to Other Agency Funds)); at least $127,000 of that sum is due to transfers from direct grant accounts to indirect grant accounts.[7] Thus, any funds which Action received from the state agency replaced direct grant funds and not independent Action funds.
 
 C
 
 16
 In sum, it is clear that, under Buchanan-Henry, all the monies in the twelve Action accounts which Palmiter seeks to garnish are funds in which the United States has a property interest and which are therefore immune from garnishment. Some of the monies are direct federal grant funds, like the $21,074.04 in the general account, which must be expended for statutorily-authorized purposes or revert to the federal government. Virtually all the remaining funds are indirect federal grant funds administered for the federal government by the state of Indiana. To the extent Action received these funds without having made expenditures for the indirect grant programs, the funds must be expended for those programs. To the extent that Action received the funds in reimbursement for initial indirect grant expenditures, the evidence is clear that Action "borrowed" other federal grant funds to make the expenditures, so that the reimbursement funds must be repaid to those accounts and used for those grant purposes. In either event, funds which can no longer be used for authorized federal grant purposes are subject to an equitable reversionary interest.
 
 II
 
 17
 Because the federal government has a property interest in virtually all the funds in Action's bank accounts, Palmiter's claim that the United States must trace each federal dollar into its particular Action account must fail. Where all the funds are federal and are immune under Buchanan-Henry, such tracing is irrelevant. 548 F.Supp. at 1172. Furthermore, on the basis of Henry the district court concluded that the federal government's property interest in these funds amounts to an equitable lien (id.) so that any arguable obligation to trace was satisfied when the federal government traced its grant funds into Action's twelve identified accounts. See Central National Bank v. Connecticut Mutual Life Insurance Co., 104 U.S. 54, 63, 26 L.Ed. 693; In re Teltronics, Ltd., 649 F.2d 1236, 1241 (7th Cir.1981). Any further burden is Palmiter's, as judgment creditor under Indiana law, to show that the property he seeks to attach is subject to execution. Hopple v. Star City Elevator Co., 140 Ind.App. 561, 224 N.E.2d 321 (1967). Because he has not shown that any of the funds in Action's 12 accounts are its own funds or otherwise free from the federal government's legal or equitable interests, he has failed to meet that burden.
 
 III
 
 18
 For the reasons given above, the May 28, 1982, restraining order against Action was properly vacated and the dismissal order of the district court is hereby affirmed.
 
 
 
 *
 The Honorable Abraham L. Marovitz, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Direct grant programs are those under which Action received funding directly from the federal government. Action received direct grants under the Headstart Program, 42 U.S.C. Secs. 9831-9852, and under the prior Community Services Administration. 548 F.Supp. 1166 at 1168-1169
 Indirect grant programs are those under which federal funds are administered by a state. Action received indirect grants administered by an Indiana state agency under the Community Services Block Grant Program, 42 U.S.C. Secs. 9901-9912, and the Energy Conservation and Production Act, 42 U.S.C. Secs. 6851-6892. 548 F.Supp. at 1169.
 
 
 [2]
 Palmiter sought to garnish these Action account balances, totaling $215,032, at the St. Joseph Bank and Trust Company of South Bend, Indiana:
 Action Acct. No. 102-04119-6 (Local Cash) $ 652.50
Action Acct. No. 102-05419-7 (No Name) 1,297.77
Action Acct. No. 12-0795-0 (SAFE) 42,035.59
Action Acct. No. 12-0795-0 (SAFE) 98,983.06
Action Acct. No. 12-0667-9 (S.E. Center) $ 1,879.65
Action Acct. No. 12-0571-2 (Petty Cash) 200.00
Action Acct. No. 12-0472-4 (Disaster Acct.) 13,348.00
Action Acct. No. 12-0370-2 (General Acct.) 21,074.04
Action Acct. No. 12-0794-2 (No Name) 1,466.54
Action Acct. No. 12-0808-7 (No Name) 30,336.09
Action Acct. No. 12-0371-0 (Payroll) 59.30
Action Acct. No. 12-0779-8 (Energy Crisis) 3,699.46
 (Plaintiff's Exh. 1, Affidavit of Phillip Hartman).
 
 
 [3]
 Without significant effect on this proceeding, by Indiana statute the IOCSA was superseded on June 30, 1982, and replaced on July 1, 1982, by the Indiana Department of Aging and Community Services ("IDACS"). 548 F.Supp. 1166, 1167 n. 1
 
 
 [4]
 Palmiter has not contended that any of these statutes or regulations authorizes the use of federal grant funds to satisfy state court personal injury actions. Nor has he shown, or has this Court found, any other basis for deciding that the United States has waived its sovereign immunity and consented to the garnishment proceeding
 Also Palmiter has not shown any real basis for his contention in Part IV of his brief that this case is an exception to the rule that federal funds not yet spent for their authorized purpose are exempt from garnishment proceedings. In seeking this exception, Palmiter argues that the reimbursement funds Action received from the state of Indiana no longer had any federally-authorized purpose to fulfill. However, as shown infra, Palmiter's contention is not supported by the facts.
 
 
 [5]
 Palmiter relies on the following provision included in Action's state contracts:
 All expenditures and payments shall be made on a REIMBURSEMENT BASIS ONLY on funds actually expended. The contractor shall not be reimbursed for any expenditures made, or cost or obligation incurred, prior to the execution of the starting date of this contract. All expenditures will be made in accordance with the attached contract budget forms.
 (Br. 17).
 
 
 [6]
 Furthermore Palmiter admits that the funds were paid for "expenditures actually made or expenses incurred" (Br. 9). Payment for expenses incurred is not, of course, the same as reimbursement for monies actually paid out
 
 
 [7]
 The independent audit revealed the following accounts payable owed by Action's indirect grant programs to its direct grant programs:
 SAFE Outreach owed Energy Crisis
 Interevention Program (ECIP) $ 461
DOE-Weatherization owed ECIP 2,260
SAFE Outreach owed Community
 Action Administration (CAA) 18,793
DOE-Weatherization owed CAA $ 27,227
Community Services Block Grant
 owed CAA 78,552
 (Govt. Exh. 1, Schedule 4). Most of the remaining inter-program transfers were between indirect grant programs or from indirect to direct grant programs. Id.