847 F.2d 430
 Bankr. L. Rep. P 72,319
In re JOLIET-WILL COUNTY COMMUNITY ACTION AGENCY, Debtor.
Appeals of ILLINOIS DEPARTMENT OF COMMERCE AND COMMUNITY
AFFAIRS, Illinois Department of Public Health,
Illinois State Board of Education, and ACTION.
 Nos. 87-2285, 87-2467.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 1, 1988.
Decided June 1, 1988.
 
 Rosalyn B. Kaplan, Asst. Atty. Gen., Chicago, Ill., Bruce G. Forest, Civ. Div., Dept. of Justice, Washington, D.C., for appellant.
 Deborah K. Ebner, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for appellee.
 Before BAUER, Chief Judge, and POSNER and FLAUM, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 This appeal by federal and state agencies requires us to consider the status of federal grant moneys in bankruptcy. The Joliet-Will County Community Action Agency (we shall call it "Joliet-Will" for short) is a private nonprofit community service organization financed exclusively by federal and state grants. The organization's charter authorizes it to raise funds from foundations and other private donors, but apparently it has never done so. ACTION, the federal agency that has succeeded the Office of Economic Opportunity, awarded Joliet-Will two grants for a "foster grandparents" program. Other federal agencies granted money for child care, family planning, insulation for homes of low-income people, legal assistance to the poor, and other community service activities to various Illinois state agencies that in turn passed on the money to Joliet-Will (sometimes with matching state grants as well) in accordance with the terms of the federal grants. Joliet-Will was mismanaged, and ultimately went broke and filed a petition for bankruptcy under Chapter 7 of the Bankruptcy Code. A trustee was appointed. Her inventory of the assets in the possession of Joliet-Will turned up cash plus furniture, office equipment, vehicles, aluminum siding, insulation materials, and other personal property. The total value of the assets was about $97,000 and was exceeded by the claims of Joliet-Will's creditors--mainly trade creditors that had sold it building materials to be used in insulating the homes of poor people.
 
 
 2
 The federal and state agencies that are the appellants in this court claim that all of Joliet-Will's assets belong to them because all those assets are either federal or state grant money or personal property bought with such grant money, and are therefore (the appellants argue) not available for distribution to the creditors. The bankruptcy court 58 B.R. 973 (Bankr.N.D.Ill.1986), and the district court 78 B.R. 184 (N.D.Ill.1987), disagreed, ruling that Joliet-Will's assets should be distributed to the trade creditors pro rata, minus the usual costs of administration--principally trustee's fees estimated at $4,000. The district judge's order is a final order turning down the appellants' claim to the assets under the control of the trustee, and is therefore appealable.
 
 
 3
 In their briefs and at argument the appellants intimated that Joliet-Will, being just a conduit for federal and state funds, had no right to declare bankruptcy. That is not correct. A community service organization is not among the entities to which Congress in the Bankruptcy Code has denied the privilege (often of course the burden) of bankruptcy, see 11 U.S.C. Secs. 101(35), 109, for it is not a governmental unit. See United States v. Orleans, 425 U.S. 807, 816-19, 96 S.Ct. 1971, 1976-78, 48 L.Ed.2d 390 (1976). It is true that if the debtor has no assets--more precisely, if the only assets in its custody are not its property--then bankruptcy has no purpose other than the debtor's discharge; and unless the debtor is a human being rather than a corporation or other organization, discharge is significant only if the bankruptcy contemplates the reorganization of the debtor rather than, as in this case, its liquidation. See, e.g., In re UNR Industries, Inc., 725 F.2d 1111, 1113-14 (7th Cir.1984). It would be a waste of time to appoint a trustee to liquidate an assetless estate--a contradiction in terms, really, for without assets there would be no estate. So once the trustee determines that the assets in the hands of the estate are not the property of the estate, he should abandon the assets and resign as trustee. See, e.g., In re SMS, Inc., 15 B.R. 496, 501-02 (Bankr.D.Kan.1981). (Normally he will be quick to do this, because he can't be compensated in such a case. See 11 U.S.C. Sec. 326(a); In re Richards, 4 B.R. 85, 86 (Bankr.M.D.Fla.1980).) But a community service organization might have assets of its own as well as grant money from federal and state agencies, and in that event bankruptcy might serve a purpose even if the agencies were entitled to snatch back all the assets contributed by or bought with their grants.
 
 
 4
 So the right of Joliet-Will to declare bankruptcy is not in question. The only question is whether the cash, and the personal property purchased with governmental grant money, are assets of Joliet-Will and therefore within the power of the trustee in bankruptcy, or whether they are assets of the federal government and of the state agencies to which the federal government made some of the grants initially, for redistribution (along with the state's own money) to operating organizations such as Joliet-Will. The answer depends on the terms under which the grants were made. Did they constitute Joliet-Will a trustee, custodian, or other intermediary, who lacks beneficial title and is merely an agent for the disbursal of funds belonging to another? If so, the funds (and the personal property bought with them, cf. In re Kaiser, 791 F.2d 73, 77 (7th Cir.1986)) were not assets of the bankrupt estate. See 11 U.S.C. Secs. 541(b), (d); Mid-Atlantic Supply, Inc. v. Three Rivers Aluminum Co., 790 F.2d 1121, 1124-25 (4th Cir.1986); Yonkers Board of Education v. Richmond Children's Center, Inc., 58 B.R. 980 (S.D.N.Y.1986); In re Chicago, Madison & Northern Ry., 36 B.R. 292, 298 (Bankr.D.Wis.1984). Or were the grants more like payment under a contract for promised performance not actually performed? The promisee would have a contractual claim for the return of the money he had paid, but he would not have a property right in the money.
 
 
 5
 The former characterization is more apt.
 
 
 6
 1. The grants impose minute controls on the use of the funds, such that the recipient has very little discretion. See, e.g., 7 C.F.R. Sec. 3015 and ACTION's handbook for grant recipients. Each grant contains a budget specifying the items for which costs chargeable to the grant may be incurred and the amount that may be charged for each item. The grantee may not switch unused funds between items, and although he has title to any personal property bought with grant moneys he must reconvey to the government, if the government tells him to, every piece of property costing $1,000 or more. In these circumstances, the grantee's ownership is nominal, like a trustee's. Joliet-Will does not argue that personal property costing less than $1,000 should be treated differently from property costing $1,000 or more.
 
 
 7
 2. A related point is that the nature of the grantor-grantee relationship is such as to constitute the grantee in effect an agent to carry out specified tasks rather than a borrower, or an entrepreneur using invested funds.
 
 
 8
 3. Congress is traditionally chary about giving government agencies broad discretion with regard to expenditures, or authorizing such agencies to delegate discretionary authority to private groups. The statutes creating the grant programs at issue in this case do not authorize the federal government or any state government to allow appropriated funds to be used to pay creditors of a private institution unless the creditor incurred an expense specifically authorized by the grants and applicable regulations. And, as we shall see, any such creditor is protected without regard to this bankruptcy proceeding, which is essentially for the protection of creditors who may have incurred (however innocently) expenses not specifically authorized by the grants.
 
 
 9
 Not all of the grants were of federal funds, for there were some state matching grants, as we have said; and so far as we know there are no statutory limitations on the state matching grants. The trustee makes nothing of the distinction between the state and federal moneys, however, so we can proceed as if only federal funds were involved.
 
 
 10
 4. A number of cases hold that federal funds in the hands of a grantee remain the property of the federal government unless and until expended in accordance with the terms of the grant. In Buchanan v. Alexander, 45 U.S. (4 How.) 20, 11 L.Ed. 857 (1846), the Supreme Court held that the creditors of crew members of the frigate Constitution could not garnish their debtors' wages, because "the funds of the government are specifically appropriated to certain national objects, and if such appropriations may be diverted and defeated by State process or otherwise, the functions of the government may be suspended. So long as money remains in the hands of a disbursing officer, it is as much the money of the United States as if it had not been drawn from the treasury. Until paid over by the agent of the government to the person entitled to it, the fund cannot, in any legal sense, be considered a part of his effects. The purser [of the U.S.S. Constitution] is not the debtor of the seamen." Id. 45 U.S. (4 How.) at 20-21. We followed Buchanan recently in Palmiter v. Action, Inc., 733 F.2d 1244 (7th Cir.1984), which held that federal grant moneys identical to those in issue in this case could not be attached in state garnishment proceedings brought by a creditor of the recipient agency. To similar effect see, e.g., In re Penn Central Transportation Co., 831 F.2d 1221 (3d Cir.1987).
 
 
 11
 Some cases describe the government's property interest as an "equitable lien," e.g., Henry v. First National Bank, 595 F.2d 291, 308-09 (5th Cir.1979), and the result has been said to be the same as in a Buchanan or Palmiter type of case--competing, unsecured creditors lose, see id. at 309; In re Madison County Economic Opportunity Comm'n, 53 B.R. 541 (Bankr.S.D.Ill.1985). The usage is unfortunate, since as normally understood an equitable lien (on which see generally McKee-Berger-Mansueto, Inc. v. Board of Education, 691 F.2d 828, 835-37 (7th Cir.1982)) is an unperfected security interest, which the trustee in bankruptcy can set aside. See, e.g., In re Einoder, 55 B.R. 319, 327-29 (Bankr.N.D.Ill.1985); In re General Coffee Corp., 828 F.2d 699, 706 (11th Cir.1987) (dictum); 11 U.S.C. Sec. 544(a). Cases like Henry use "equitable lien" in a special sense, equivalent to beneficial ownership.
 
 
 12
 It might seem that we could rest comfortably on Buchanan, a decision whose authority seems not to have been impaired by its great age, and on Palmiter, a recent decision of this circuit. However, neither is a bankruptcy case, and Buchanan in particular, as our quotation from the opinion indicates, frames the issue as one of federal supremacy. Rights in bankruptcy are largely defined by state law, so the interposition of a bankruptcy proceeding does not necessarily alter the situation. The trustee argues, however, that federal bankruptcy law should enjoy parity with the doctrine forbidding the diversion of federal funds to creditors claiming under state law, and hence that while the federal grants may preempt state garnishment proceedings, they surely cannot be thought to preempt federal bankruptcy law. But the issue is not preemption. A recipient of federal grant money can declare bankruptcy. The issue is who owns the money and the personal property bought with it. (The trustee does not argue that these two classes of Joliet-Will's assets should be treated differently.) We can find no evidence that the authors of the Bankruptcy Code intended to deprive the federal government of property rights that it would enjoy against an unsecured creditor, merely because the creditor is represented by a trustee in bankruptcy.
 
 
 13
 5. Last and least, we note the treatment of such grants in other areas of law, notably criminal law, where thefts of federal grant money (or personal property bought with such money) are treated as thefts from the federal government, though for reasons of policy not obviously present here, primarily the lack of incentive of states to prosecute crimes in which the only victim is the federal government. See, e.g., United States v. Harris, 729 F.2d 441, 445 (7th Cir.1984); United States v. Scott, 784 F.2d 787, 791 (7th Cir.1986) (per curiam); United States v. Wheadon, 794 F.2d 1277, 1285 (7th Cir.1986); Hayle v. United States, 815 F.2d 879, 882 (2d Cir.1987). United States v. Montoya, 716 F.2d 1340, 1343-44 (10th Cir.1983), involved the same type of "weatherization" grant involved in the present case.
 
 
 14
 Practical considerations support characterization of these grant moneys as property of the grantors until expended in accordance with the terms of the grants. For consider how these creditors will fare if the appellants succeed in removing Joliet-Will's assets from the bankrupt estate. The personal property will be sold, and the proceeds, along with the (other) cash in Joliet-Will's possession, will be returned to the federal and state agencies that originally awarded the grants. Creditors will apply to the agencies for the payment of their invoices, and any creditor who had made a sale to Joliet-Will that was within the scope of one of the grants would--the government concedes--be entitled to payment out of the recovered grant moneys. Some creditors would, it is true, be left out in the cold because Joliet-Will violated the terms of the grant. For example, in its waning days Joliet-Will sold some of the building materials it had earlier bought, in order to raise cash. These sales were unauthorized. Suppose someone had put down a deposit on some of these materials and lost the deposit when Joliet-Will went broke. He could not recover his deposit from the grant moneys. Nor could someone who had obtained a tort judgment against Joliet-Will--say because one of its drivers had, while on the agency's business, run him over--collect the judgment out of the grant moneys. These claimants would be unsecured creditors in bankruptcy, but outside of bankruptcy would have no claim against the grant moneys, because the grants do not authorize refunds to buyers of building materials, or payments of accident claims. All Joliet-Will's creditors who had dealt with it within the term of the grants, however, would be entitled to participate in the distribution of the grant moneys, and the balance of those moneys would presumably be exhausted in the distribution.
 
 
 15
 The argument is thus over distribution, rather than the total to be recovered by creditors. Creditors as a whole can do no better if the $97,000 worth of cash and personal property in Joliet-Will's hands is distributed by the trustee in bankruptcy instead, although particular creditors may do better. The bankruptcy does not enlarge the pool available to creditors, but actually shrinks it. The costs of bankruptcy administration, including the trustee's fee (more than 4 percent of the assets in this case--greater, of course, in some other cases, see 11 U.S.C. Sec. 326(a)), will be deducted from the pool. No corresponding costs will be charged to creditors if the $97,000 is returned to the federal and state agencies to distribute to creditors in accordance with the terms of the grants and with any procedure for allocating loss (in the event of a shortfall) that the agencies may use, subject to judicial review. The procedure endorsed by the bankruptcy judge and the district judge simply interposes another level of administration between the federal agencies that funded Joliet-Will and the creditors left holding the bag when Joliet-Will collapsed.
 
 
 16
 Distribution in bankruptcy normally would result in each creditor's receiving his pro rata share of the debtor's assets ("equity is equality"), including creditors who might receive nothing if they had to make application to the federal or state granting agencies. Those applications might result in some creditors receiving payment in full and others nothing at all, even if none of the creditors had known or had reason to know, or any feasible way of discovering, whether in dealing with them Joliet-Will had been violating the terms of its federal or state grants. On the other hand the risk of a bad debt is omnipresent, and the remedies of unsecured creditors in bankruptcy rarely adequate. So it is far from clear that the result we reach today will work a substantial, unanticipated hardship on particular creditors; and creditors as a group will benefit by being spared the expense of a proceeding in bankruptcy. Moreover, the state agencies are rightly concerned that if federal grant moneys that they passed through to Joliet-Will are disbursed by order of the bankruptcy court in ways not authorized by the terms of the grants, they will be liable to the federal government for misuse of federal government funds. See 42 U.S.C. Sec. 9904(g). On balance the bankruptcy solution has little to recommend it.
 
 
 17
 The clincher is that the trustee in bankruptcy says that she intends to distribute the assets of the bankrupt agency in accordance with the terms of the grant, rather than the standard pro rata method of bankruptcy. If she is allowed to do this she will be usurping a disbursement function that Congress has assigned to the government rather than to private persons appointed to be trustees in bankruptcy. It may cost society more to distribute the assets through the bureaucracy than the modest $4,000 fee charged by the trustee, but this consideration does not authorize us to reassign property rights from their owners to the debtor.
 
 
 18
 A practical problem, surprisingly not addressed by the parties, is the mechanics of "abandonment." When the trustee resigns and abandons the cash and inventory, who gets them? The ownership of these assets is divided among a number of federal and state entities, in proportions by no means obvious. Someone will have to take possession of them and dole them out to the agencies, which in turn will dole them out to the creditors. The parties have not told us who that someone will be, but it is clear that it is not the trustee in bankruptcy.
 
 
 19
 The judgment of the district court is reversed with directions to instruct the bankruptcy court to direct the trustee to abandon the assets held by Joliet-Will.
 
 
 20
 REVERSED.