(Slip Opinion)

# Application of the Hyde Amendment to Federal Student-Aid Programs

The Hyde Amendment in the Department of Education's annual appropriations legislation for fiscal years 2020 and 2021 applies to the funding in that legislation for Federal Pell Grants, Federal Supplemental Opportunity Grants, Scholarships for Veteran's Dependents, and Federal Work-Study Programs. But additional sources of federal funding for these programs provided in other statutes are not subject to the Hyde Amendment.

Federal student-aid funding subject to the Hyde Amendment remains so after it is paid to higher-education institutions for disbursement. These institutions must therefore comply with the Hyde Amendment in expending such funds.

January 16, 2021

MEMORANDUM OPINION FOR THE
PRINCIPAL DEPUTY GENERAL COUNSEL
DEPARTMENT OF EDUCATION

For over forty years, Congress has included a provision in the annual appropriations legislation for the Departments of Labor, Health and Human Services, and Education restricting the use of federal funds for certain abortions. In its current form, this restriction—commonly known as the Hyde Amendment—provides that "[n]one of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for any abortion" or "for health benefits coverage that includes coverage of abortion," except in limited circumstances. Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. H, §§ 506–07, 134 Stat. 1182 (Dec. 27, 2020). You have asked (1) whether the Hyde Amendment applies to the current federal funding for four student-aid programs administered by the Department of Education ("Department")—Federal Pell Grants, Federal Supplemental Opportunity Grants, Scholarships for Veteran's Dependents, and Federal Work-Study Programs—and (2) to the extent that it does, whether federal funds subject to the Hyde Amendment remain so restricted after they are paid to higher-education institutions for disbursement.

We conclude that the Hyde Amendment applies to some, but not all, of the current federal funding for these programs. Specifically, the Hyde Amendment in the Department's annual appropriations legislation for

1

fiscal years 2020 and 2021 applies to the student-aid funding in that legislation, but additional sources of federal funding for these programs provided in other statutes are not subject to the Hyde Amendment. We further conclude that federal student-aid funding subject to the Hyde Amendment remains so after it is paid to higher-education institutions for disbursement and that these institutions must therefore comply with the restriction in expending such funds.[1]

## I.

In the immediate aftermath of *Roe v. Wade*, 410 U.S. 113 (1973), federal funds were available to provide abortions, most prominently through the Medicaid program. *See* Jon O. Shimabukuro, Cong. Research Serv., RL 33467, *Abortion: Judicial History and Legislative Response* 15 (updated Sept. 9, 2019); Laurence H. Tribe, *Abortion: The Clash of Absolutes* 151–52 (1990). Congress responded by enacting various provisions to restrict such use of federal funds. The first post-*Roe* restriction appeared in the Foreign Assistance Act of 1973 and prohibited the use of certain funds "to pay for the performance of abortions as a method of family planning or to motivate or coerce any person to practice abortions." Pub. L. No. 93-189, § 2(3), 87 Stat. 714, 716 (1973).

Three years later, Representative Henry Hyde introduced a similar restriction to the annual appropriations bill for the Department of Labor and the Department of Health, Education, and Welfare ("HEW") (the predecessor to the Departments of Health and Human Services ("HHS") and Education). As adopted, the Hyde Amendment provided: "None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term." Departments of Labor and Health, Education, and Welfare Appropriations Act, 1977, Pub. L. No. 94-439, § 209, 90 Stat. 1418, 1434 (1976). In 1980, the Supreme Court upheld the Hyde Amendment against various constitutional challenges. *See Harris v. McCrae*, 448 U.S. 297, 311–27 (1980); *see also Williams v. Zbaraz*, 448 U.S. 358, 368–69 (1980) (upholding analogous state restriction).

---

[1] In addition to your office, we also consulted the Office of Management and Budget's Office of General Counsel on this question.

Until the 1990s, the Hyde Amendment remained largely unchanged except for variations in the breadth of its exception, which sometimes included only one for the life of the mother and other times included exceptions for rape or incest, or to prevent severe and long-lasting physical health damage to the mother. Since fiscal year 1994, the Hyde Amendment has included an exception for rape or incest, as well as for the life of the mother. *See, e.g.*, Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1994, Pub. L. No. 103-112, § 509, 107 Stat. 1082, 1113 (1993).

In 1997, Congress revised the Hyde Amendment in two significant respects. First, Congress prohibited the expenditure of federal funds not only for "any abortion" but also for "health benefits coverage that includes coverage of abortion." Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-78, § 509(a)–(b), 111 Stat. 1467, 1516 (1997). The provision defined "health benefits coverage" as "the package of services covered by a managed care provider or organization pursuant to a contract or other arrangement." *Id.* § 509(c), 111 Stat. at 1516. Second, Congress revised the Hyde Amendment's exception to cover only cases where "the pregnancy is the result of an act of rape or incest" or "a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed." *Id.* § 510(a), 111 Stat. at 1516.

The Hyde Amendment continues in the law in this form except for one additional revision to cover appropriations made to trust funds. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 508(a)–(b), 112 Stat. 2681, 2681-385 (1998) (adding this provision for the first time). Congress most recently included this version of the Hyde Amendment in the Department of Education's annual appropriations legislation for fiscal year 2021. *See* Pub. L. No. 116-260, div. H, §§ 506–07.

## II.

You have asked whether the Hyde Amendment restricts the current federal funding for four student-aid programs authorized by title IV of the

Higher Education Act of 1965 ("HEA"), as amended (20 U.S.C. ch. 28, subch. IV): Federal Pell Grants ("Pell Grants"), 20 U.S.C. § 1070a; Federal Supplemental Education Opportunity Grants ("SEOG"), *id.* §§ 1070b to 1070b-4; Scholarships for Veteran's Dependents, also known as Iraq and Afghanistan Service Grants ("Service Grants"), *id.* § 1070h; and Federal Work-Study Programs ("Work-Study"), *id.* §§ 1087-51 to 1087-58. We conclude that the Hyde Amendment in the Department's current appropriations legislation applies to all the funding for these programs in that legislation, but that the additional sources of federal funding provided in the programs' authorizing statutes are not part of the annual appropriations laws covered by the Hyde Amendment. As a result, the Hyde Amendment applies to all the current federal funding for SEOG and Work-Study but to only some of the current federal funding for Pell Grants and Service Grants.

## A.

We understand that the primary source of funding for these federal student-aid programs comes from the Department's annual appropriations. The most recent legislation provides approximately $24.5 billion "[f]or carrying out subparts 1, 3, and 10 of part A, and part C of title IV of the HEA," which correspond to the four student-aid programs. Pub. L. No. 116-260, div. H, tit. III; *see also id.* (providing additional funds for "Federal administrative expenses" related to these and other programs). That legislation also contains a Hyde Amendment, which applies to any funds "appropriated in this Act." *Id.* § 506(a)–(b). The relevant "Act" in this case is division H of the legislation. *See id.* § 3 ("Except as expressly provided otherwise, any reference to 'this Act' contained in any division of this Act shall be treated as referring only to the provisions of that division."). And title III of division H appropriates the funding for each of the four student-aid programs. Thus, by its plain terms, the Hyde Amendment applies to this funding.[2]

---

[2] The Department could also draw upon the federal student-aid funding in its appropriations legislation for fiscal year 2020 since that funding remains available through September 30, 2021. *See* Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. A, 133 Stat. 2534, 2591–92 (2019). Because that legislation contains the

This conclusion is also supported by precedent. Both this Office and the Secretary of HEW have previously read materially similar language in prior Hyde Amendments to apply to *all* the funds in the Department's annual appropriations legislation. For instance, soon after its enactment, we read the original Hyde Amendment as "forbid[ding] the use of *any* HEW funds to perform abortions except when the mother's life is in danger." Memorandum for Patricia M. Wald, Assistant Attorney General, Office of Legislative Affairs, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Constitutional Amendments Relating to Abortion* at 3 (May 19, 1977) (emphasis added). That legislation, like the current one, included federal funding for student aid. *See* Pub. L. No. 94-439, 90 Stat. at 1428. A year later, the Secretary of HEW likewise construed the Hyde Amendment in HEW's annual appropriations as "applicable to *all* of the Department's appropriated funds" and thus concluded that the Department lacked "statutory authority to fund *any* abortions other than those specifically provided for [in the provision]." Federal Financial Participation in Expenditures for Abortions Funded Through Various HEW Programs, 43 Fed. Reg. 4832, 4836 (Feb. 3, 1978) (emphasis added); *see also* Federal Funding of Abortion, 43 Fed. Reg. 31,868, 31,875 (July 21, 1978) ("[The Hyde Amendment] prohibits the use of *any* funds appropriated under [the legislation] to pay for abortions except for the three specified exceptions." (emphasis added)). As the Attorney General explained at the time, such a construction by "the administrative officer charged with enforcement of the [Hyde Amendment] . . . is entitled to great weight." *Proposed Regulations of the Department of Health, Education and Welfare Pertaining to Federal Funding of Abortions*, 43 Op. Att'y Gen. 110, 115 (1978) (Bell, Att'y Gen.) ("*Proposed Regulations Pertaining to Federal Funding of Abortions*").

In 1997, we similarly interpreted an analogous funding restriction to prohibit federal funds from being used for student-aid programs at higher-education institutions. *See Applicability of Section 514 of the 1997 Education Appropriations Act to Post-Secondary Student Aid Programs*, 21 Op. O.L.C. 143 (1997) ("*Applicability of Section 514*"). That funding restriction barred the use of funds for higher-education institutions that

---

same funding provision and Hyde Amendment as the fiscal year 2021 legislation, *see id.* §§ 506–07, 133 Stat. at 2591–92, 2606–07, the same analysis would apply.

prohibited ROTC or military recruitment on campus and provided that "[n]one of the funds made available in this or any other Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act for any fiscal year may be provided by contract or by grant (including a grant of funds to be available for student aid)" to such a higher-education institution. Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 514(a)–(b), 110 Stat. 3009, 3009-270 to 3009-271 (1996); *see also id.* § 508, 110 Stat. at 3009-269 (Hyde Amendment). Because this restriction targeted contracts or grants provided "to" higher-education institutions, we concluded that the restriction applied to "campus-based programs" (including SEOG and Work-Study) for which the institutions themselves apply and exercise discretion over their administration. *Applicability of Section 514*, 21 Op. O.L.C. at 145–46. But it did not apply to "direct aid programs" (including Pell Grants) for which individual students apply and which the institutions only serve as the disbursing agent. *Id.* at 143, 145–46; *see also id.* at 147–49 (citing legislative history to support distinction). Unlike this prior restriction, the Hyde Amendment is not limited to funds provided "to" higher-education institutions, and so the distinction between "campus-based" and "direct aid" is not relevant here. But the Hyde Amendment does apply to all funds in the Department's annual appropriations—just as the prior funding restriction did—and thus should likewise be understood to apply to the student-aid funding in the Department's current appropriations legislation.

In sum, the language of the appropriations legislation and precedent make clear that the Hyde Amendment in the Department's annual appropriations legislation applies to all the funding for the four student-aid programs provided in that legislation.

## B.

We understand that the Department's annual appropriations provide the sole current source of federal funding for SEOG and Work-Study, which means that all the federal funding for those programs is subject to the Hyde Amendment. *See* E-mail for Devin A. DeBacker, Deputy Assistant Attorney General, Office of Legal Counsel, from Andy K. Lieberman, Assistant General Counsel, Office of Management and Budget, *Re: Hyde*

*Amendment* (Oct. 6, 2020, 5:15 PM) ("October 6 OMB E-mail"). There are, however, additional sources of federal funding for Pell Grants and Service Grants. By its terms, the Hyde Amendment in the Department's most recent appropriations legislation applies only to the funding appropriated in *that* legislation (and in certain trust funds) and thus would not restrict other sources of program funding. *See* Pub. L. No. 116-260, div. H, § 506(a)–(b); *cf. Prohibitions and Penalties Under Section 582 of the 1990 Foreign Operations, Export Financing, and Related Programs Appropriations Act*, 14 Op. O.L.C. 84, 86 (1990) (contrasting language in a similar provision with restrictions that also apply to appropriations in other legislation). We have not identified any other Hyde Amendment that would apply to these additional sources of current funding for Pell Grants and Service Grants.

Pell Grant awards have two components: a baseline award and a mandatory add-on used to increase the size of the total potential award. *See* 20 U.S.C. § 1070a(b)(2)(A)(i)–(ii). The baseline award is set each year in the Department's annual appropriations legislation. *See id.* § 1070a(b)(2)(A)(i) (keying the award to the "maximum Federal Pell Grant, as specified in the last enacted appropriation Act applicable to that award year"); *see also, e.g.*, Pub. L. No. 116-260, div. H, tit. III (setting the "maximum" award for 2021–22 at $5,435). The mandatory add-on is calculated based on a formula in the Pell Grants statute. *See* 20 U.S.C. § 1070a(b)(2)(A)(ii), (7)(B)–(C). As explained below, both components are funded by sources other than the funding provided in the Department's annual appropriations.

The baseline award for Pell Grants has an additional funding source in the form of mandatory funding in the program's authorizing statute. *See* 20 U.S.C. § 1070a(b)(7)(A)(iv). Congress initially enacted this mandatory funding for only fiscal year 2011, *see* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2101(a)(2)(A)(ii), 124 Stat. 1029, 1071, but later extended the funding through fiscal year 2021 and beyond, *see* Department of Defense and Full-Year Continuing Appropriations Act, 2011, Pub. L. No. 112-10, § 1860(a)(3)(A), 125 Stat. 38, 169.[3]

---

[3] This 2011 legislation carried forward both appropriations and restrictions from prior legislation subject to the Hyde Amendment. *See* Pub. L. No. 112-10, § 1101(a)(6), 125 Stat. at 102–03; *see also* Consolidated Appropriations Act, 2010, Pub. L. No. 111-117,

The mandatory funding for any fiscal year remains available through the end of the following fiscal year. *See* 20 U.S.C. § 1070a(b)(7)(F).

We do not believe that the Hyde Amendment applies to the mandatory funding for fiscal years 2020 or 2021 (the only years at issue here). The original legislation that established this funding was not subject to the Hyde Amendment. *See generally* Pub. L. No. 112-10, § 1860(a)(3)(A), 125 Stat. at 169. And although Congress subsequently increased the funding for these fiscal years—sometimes in legislation subject to the Hyde Amendment, *see* Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, div. F, §§ 309(f), 506–507, 125 Stat. 786, 1103, 1111–12 (2011)—it most recently did so in legislation *not* subject to the Hyde Amendment, *see* Fostering Undergraduate Talent by Unlocking Resources for Education Act, Pub. L. No. 116-91, § 7, 133 Stat. 1189, 1196 (2019). Thus, even if later increases to mandatory funding might subject the funding to restrictions contained in the later legislation, *but cf.* E-mail for Devin A. DeBacker, Deputy Assistant Attorney General, Office of Legal Counsel, from Andy K. Lieberman, Assistant General Counsel, Office of Management and Budget, *Re: Hyde Amendment* (Dec. 14, 2020, 9:34 AM) ("December 14 OMB E-mail") (disagreeing with that view), the mandatory funding for these years is not subject to the Hyde Amendment under either the original legislation or the most recent legislation.[4]

---

div. D, § 507–08, 123 Stat. 3034, 3267, 3280 (2009). But this carry-forward provision addressed only appropriations "not otherwise specifically provided for" in the 2011 legislation. Pub. L. No. 112-10, § 1101(a), 125 Stat. at 102. We therefore believe that the prior legislation's restrictions, including the Hyde Amendment, are inapplicable to funds appropriated by provisions of the 2011 legislation that are independent of the carry-forward provision, such as the section that provides the mandatory funding for Pell Grants. *See id.* § 1860(a)(3)(A), 125 Stat. at 169; *see also* E-mail for Devin A. DeBacker, Deputy Assistant Attorney General, Office of Legal Counsel, from Andy K. Lieberman, Assistant General Counsel, Office of Management and Budget, *Re: Hyde Amendment* (Dec. 14, 2020, 9:34 AM) (concluding same). In addition, another provision of the 2011 legislation would appear to limit the duration of any restrictions to September 30, 2011, making them inapplicable here. *See* Pub. L. No. 112-10, § 1104, 125 Stat. at 103.

[4] At times, Congress has also "rescinded" some of this mandatory funding—including the funding for fiscal years 2020 and 2021—in legislation subject to the Hyde Amendment. *See* Pub. L. No. 116-260, §§ 309, 506–507; Pub. L. No. 116-94, §§ 309, 506–07, 133 Stat. at 2596, 2606–07. Because a rescission simply "cancels" previously enacted budget authority, *see* Government Accountability Office, *A Glossary of Terms Used in the Federal Budget* Process 85 (2005), we do not believe that this change subjects the remain-

The Hyde Amendment also does not apply to the mandatory add-on for Pell Grants, which has an additional funding source in the form of a permanent, indefinite appropriation. See 20 U.S.C. § 1070a(b)(7)(A)(iii). As its name suggests, a permanent, indefinite appropriation is one not limited by time or amount and thus does not require further congressional action for the agency to spend funds. *See, e.g.*, *Unexpended Balances of Appropriations*, 13 Op. Att'y Gen. 288, 292 (1870) (Akerman, Att'y Gen.); Letter for Alan K. Simpson, Chairman, Subcommittee on Nuclear Regulation, Senate Committee on Environment and Public Works, B-197742, 1986 WL 63966, at *8 (Comp. Gen. Aug. 1, 1986) ("[A] 'permanent, indefinite' appropriation . . . operates completely independent of the congressional authorization and appropriation process. It has no fiscal year limitations, there is no limit on the amount of the appropriation, and there is no need for Congress to appropriate funds to it annually or otherwise."). Congress first created the mandatory add-on in the form of a temporary, definite appropriation, *see* College Cost Reduction and Access Act, Pub. L. No, 110-84, § 102(b), 121 Stat. 784, 785 (2007), and later converted the funding to a permanent, indefinite appropriation, *see* Pub. L. No. 111-152, § 2101(a)(2)(A)(ii), 124 Stat. at 1071. No Hyde Amendment applies to either legislation, and Congress has not substantively amended the mandatory add-on since then.[5] Thus, this additional funding for Pell Grants is not subject to the Hyde Amendment.

That said, we do not view this permanent, indefinite appropriation (which is not subject to the Hyde Amendment) as the exclusive source of funding for the mandatory add-on. The permanent, indefinite appropriation does not foreclose the Department from using the Hyde-restricted funds in its annual appropriations legislation to fund the mandatory add-on. Section 1070a(b)(7)(A) expressly provides that the following appropriations—including the permanent, indefinite appropriation in clause

---

ing funds for these fiscal years to the Hyde Amendment. *See also* December 14 OMB E-mail (concluding same).

[5] Congress made a technical amendment to the mandatory add-on provision in legislation, discussed above, that carried forward the Hyde Amendment from a prior year. *See* Pub. L. No. 112-10, §§ 1101(a)(6), 1860(a)(4), 125 Stat. at 103, 169–70 (renumbering the relevant paragraph from (8) to (7)). But for the same reasons as explained above, we do not believe that the carry-forward provision subjects this funding to the Hyde Amendment. *See supra* note 3; *see also* October 6 OMB E-mail (concluding same).

(iii)—are "in addition to any other amounts appropriated to carry out this section." 20 U.S.C. § 1070a(b)(7)(A). This language indicates that the permanent, indefinite appropriation was meant to add to—rather than crowd out—other appropriations for the same purpose. Thus, although we have sometimes cited a rule of construction from the Government Accountability Office ("GAO") that "an agency may not use generally appropriated funds if there is a specific appropriation for that purpose,"[6] that rule would not apply here. *See, e.g.*, *Office of the Special Inspector General for the Troubled Asset Relief Program–Use of Amounts for Oversight Activities*, B-330984, 2020 WL 2745285, at *4 (Comp. Gen. May 27, 2020); GAO, *Principles of Federal Appropriations Law* 3-411 (4th ed. 2017) ("*Federal Appropriations Law*"); *cf. Funds Available for Payment of Natural Resource Damages Under the Oil Pollution Act of 1990*, 21 Op. O.L.C. 188, 195 (1997) ("the specific/general principle . . . is but a canon of statutory construction which, like other such rules, must yield to superior evidence of legislative intent"). Indeed, the Attorney General has previously found multiple appropriations to be available for the same purpose even when one of those appropriations was permanent and indefinite. *See Second Liberty Bond Act—Foreign Currency Obligations*, 43 Op. Att'y Gen. 140, 148–49 (1978) (Bell, Att'y Gen.) (requiring evidence of a congressional "intention that a specific class of expenditures were to be met from one and only one account"). Nor do we think that section 1070a(b)(7)(B)—which provides that the appropriations in section 1070a(b)(7)(A)(i) through (iii) "shall be used" to fund the mandatory add-on—counsels a different reading. That provision merely requires certain appropriations to be used for the mandatory add-on; it does not foreclose the Department from using additional appropriations for the same end. We therefore believe that the Department may use either its Hyde-restricted annual appropriation or its non-restricted permanent, indefinite appropriation to carry out the mandatory add-on.

---

[6] *Authority of the Environmental Protection Agency to Indemnify Its Employees*, 13 Op. O.L.C. 46, 46 n.3 (1989); *see also* GAO, *Principles of Federal Appropriations Law* 3-407 to 3-410 (4th ed. 2017). *But cf. Panama Canal Appropriations—Marine Barracks at Ancon*, 26 Op. Att'y Gen. 81, 82–84 (1906) (Moody, Att'y Gen.) (noting that "[t]here is no such *statutory* limitation on the use of appropriations" and noting instances where the rule has not been applied).

Service Grants also have an additional funding source in the form of a permanent, indefinite appropriation in the program's authorizing statute. *See* 20 U.S.C. § 1070h(f); *see also* December 14 OMB E-mail (explaining that the Department could also draw upon the discretionary funding in its annual appropriations legislation to carry out the Service Grants program subject to certain potential restrictions). Congress created this funding in legislation that was not subject to the Hyde Amendment, *see* Pub. L. No. 111-39, § 401(a)(9), 123 Stat. 1934, 1939–40 (2009), and has not amended the appropriation since its original enactment. Thus, this additional funding for Service Grants is also not subject to the Hyde Amendment.

We therefore conclude that the Hyde Amendment applies to all the federal funding for SEOG and Work-Study and to the funding for Pell Grants and Service Grants provided in the Department's annual appropriations, but that the Hyde Amendment does not restrict the use of federal funding for Pell Grants and Service Grants that derives from other funding statutes.[7]

### III.

Under the HEA and its implementing regulations, higher-education institutions help the Department disburse federal student aid and in some cases even have discretion to determine which students receive aid. *See generally* 20 U.S.C. §§ 1070a(a), 1070b-2, 1070h(d), 1087-53; 34 C.F.R. § 668.164; *see also Applicability of Section 514*, 21 Op. O.L.C. at 144–45. Institutions may disburse aid either by crediting a student's account for certain expenses provided by the institution or by paying the funds directly to the student. *See* 34 C.F.R. § 668.164(c)–(d); E-mail for Henry C. Whitaker, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Reed Rubinstein, Principal Deputy General Counsel, Department of Education, *Re: Opinion Questions* (Sept. 30, 2020, 9:53 AM). In light of this system, you have asked whether federal student-aid funds restricted by the Hyde Amendment remain so after they are paid to higher-education institutions for disbursement. We believe that such funds do remain subject to the Hyde Amendment and therefore may not be

---

[7] We have not been asked and therefore do not address in what order the Department may draw upon these different sources of restricted and non-restricted funding.

expended for abortions or health benefits coverage that includes coverage of abortions except in cases that fall within the Amendment's specified exceptions.

We think this conclusion follows from the structure of the statutory and regulatory scheme, which demonstrates that student-aid funds remain federal funds even after they are paid to higher-education institutions for disbursement. The HEA itself recognizes this point in authorizing the Secretary of Education to impose requirements on institutions "to protect the financial interest of the United States" in student-aid funds. 20 U.S.C. § 1099c(e)(1); *cf. United States v. Maxwell*, 588 F.2d 568, 572 (7th Cir. 1978) (relying on this language in a prior version of the HEA in concluding that student-aid funds paid to an institution remained federal funds). And the Act's implementing regulations make the point even more clearly. For instance, in prescribing various "Cash Management" rules, the regulations repeatedly refer to student-aid funds held by institutions as "title IV, HEA program funds," *see, e.g.*, 34 C.F.R. § 668.161(a)(1), and, in fact, require institutions to hold such funds in a depository account specifically named "Federal Funds," *id.* § 668.163(a)(2)(i). Likewise, in describing the "Federal interest" in student-aid funds, the regulations specify that institutions hold most such funds "in trust for the intended beneficiaries or the Secretary," *id.* § 668.161(b), and thus the Department has described institutions as "trustee[s] of Federal Funds," Program Integrity and Improvement, 80 Fed. Reg. 28,484, 28,492 (May 18, 2015); *cf. United States v. Rowen*, 594 F.2d 98, 100 (5th Cir. 1979) (emphasizing this trust relationship in holding that student-aid funds paid to an institution remain federal funds); *Maxwell*, 588 F.2d at 572 (same). The regulations also require institutions to pay certain interest earned on student-aid funds back to the federal government, 34 C.F.R. § 668.163(c)(3), and to do the same for "excess cash" above a certain amount, *id.* § 668.166(b). *See also id.* § 668.21(a)(1) (requiring higher-education institutions to return student-aid funds if a student does not begin attendance at the institution); *id.* § 668.22(a)(1) (same if a student withdraws); *cf. Maxwell*, 588 F.2d at 572 (pointing to the government's "reversionary interest" in student-aid funds in concluding that such funds remain federal funds).

Based on these provisions and other features of supervision and control exercised by the Department, courts have readily found in other contexts that student-aid funds remain federal funds even after they are paid to

higher-education institutions for disbursement. *See, e.g.*, *United States v. Eden*, 659 F.2d 1376, 1380 (9th Cir. 1981); *United States v. Smith*, 596 F.2d 662, 664 (5th Cir. 1979); *Rowen*, 594 F.2d at 99–101; *Maxwell*, 588 F.2d at 571–74; *see also United States v. Evans*, 572 F.2d 455, 471–74 (5th Cir. 1978) (reaching the same conclusion as to certain federal student loans); *cf. Cal. Trade Tech. Schs., Inc. v. United States*, 923 F.2d 641, 644–46 (9th Cir. 1991). As one court explained, "[w]hile identifiable funds appropriated for use in a federal program are in transit between their federal source and their intended recipient and are still subject to substantial federal controls, they remain federal funds." *Smith*, 596 F.2d at 664; *cf. Palmiter v. Action, Inc.*, 733 F.2d 1244, 1247 (7th Cir. 1984) (concluding that the funds held by a non-profit under another federal program were federal funds because the organization served as "only one link in the bureaucratic chain necessary to move funds from the United States Treasury to [the ultimate beneficiaries]" (internal quotation marks omitted)). We agree with this reasoning and conclude that student-aid funds remain federal funds after they are paid to higher-education institutions for disbursement.[8] Thus, funds "appropriated in" legislation subject to the Hyde Amendment remain so after they are paid to institutions for disbursement. Pub. L. No. 116-260, div. H, § 506(a)–(b).

Nor do we think it matters for purposes of the Hyde Amendment that higher-education institutions—rather than the Department—will be the ones to "expend" the federal funds. *See Effect of Spending Prohibition on HUD's Satisfaction of Contractual Obligations to ACORN*, 33 Op. O.L.C. 339, 340 (2009) (explaining that the term the term "expenditure" has been "broadly defined" in the appropriations context as "the actual spending of money; an outlay" (cleaned up)); 1 *Federal Appropriations Law* 5-3 (3d ed. 2004) ("The expenditure is the disbursement of funds to pay the obligation."); *see also* 34 C.F.R. § 668.164 (describing the various ways in which institutions may pay funds to students). We do not interpret the

---

[8] This specific reasoning would not apply to federal student-aid funds once they are paid to students (ordinarily the intended recipients) or to funds used for certain other purposes, such as for institutional administrative expenses. *See* 20 U.S.C. § 1096(a); *see also* 34 C.F.R. § 668.161(b) (excluding administrative expenses and funds for a specific program from the trust relationship). We have not been asked and therefore do not resolve whether such funds would nonetheless remain subject to the Hyde Amendment. *See also infra* note 11.

term "expend" in the Hyde Amendment as inherently limiting its reach to only federal funds spent by the federal government. From the beginning, Congress has phrased the Hyde Amendment in the passive voice, which generally "focuses on an event that occurs without respect to a specific actor." *Dean v. United States*, 556 U.S. 568, 572 (2009); *see also Watson v. United States*, 552 U.S. 74, 81 (2007) (explaining that a statute's use of the passive voice expresses "agnosticism" with respect to "who" does the action). And although this passive construction, standing alone, might leave some ambiguity about the Hyde Amendment's scope, *cf. NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992), we believe that statutory context and long-standing administrative practice under the provision clarify any ambiguity here.

Statutory context shows that the Hyde Amendment restricts the use of funds by third parties who assist in administering the federal program in question being funded. In its current form, the Hyde Amendment includes an exemption for some such third parties: "Nothing in the preceding section shall be construed as prohibiting the expenditure by a State, locality, entity, or private person of State, local, or private funds (other than a State's or locality's contribution of Medicaid matching funds)." Pub. L. No. 116-260, div. H, § 507(b); *see also* H.R. Rep. No. 105-390, at 119 (1997) (Conf. Rep.) (discussing provision).[9] This statutory exemption, which excludes most non-federal funds expended by third parties, would be superfluous if the Hyde Amendment applied only to direct expenditures by the federal government. *See, e.g.*, *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 537–38 (2015); *Entitlement to Reservist Differential Pay Under the Pre-Amendment Version of 5 U.S.C. § 5538*, 34 Op. O.L.C. 193, 198 (2010) ("The principle that a statute should be construed so that effect is given to all its provisions so that no part will be inoperative or superfluous, void or insignificant is one of the most basic interpretive canons." (cleaned up)). To give effect to this exemption, the Hyde Amendment should be read to

---

[9] Thus, the Hyde Amendment does not restrict student-aid funds that come from sources other than the federal government. *See, e.g.*, 20 U.S.C. § 1087-53(b)(5) (providing that the "Federal share" of student compensation under the Work-Study program generally may not exceed 75 percent, subject to certain exceptions); *id.* § 1087-53(c)(3), (d)(3), (e)(3) (describing additional restrictions and exceptions); 34 C.F.R. § 675.26 (describing the "Federal share" limitation).

apply to expenditures by third parties, including higher-education institutions, so long as they are expenditures of *federal* funds.

Long-standing administrative practice under the Hyde Amendment also confirms our conclusion. In 1977, Congress enacted a version of the Hyde Amendment that included a provision directing the Secretary of HEW to "promptly issue regulations and establish procedures to ensure that the provisions of this section are rigorously enforced." Making Further Continuing Appropriations for the Fiscal Year 1978, and for Other Purposes, Pub. L. No. 95-205, § 101, 91 Stat. 1460, 1460 (1977). As the Attorney General explained at the time, "Congress intended to leave many matters of interpretation concerning [this Hyde Amendment] to the sound discretion of the Secretary, rather than attempt a more detailed statutory scheme." *Proposed Regulations to Federal Funding of Abortions*, 43 Op. Att'y Gen. at 111. Thus, as the Attorney General noted, the Secretary's construction was entitled to "great weight." *Id.* at 115; *see also, e.g.*, *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978) (administrative practice "has peculiar weight when it involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new" (alteration in original) (quoting *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933))).

The Secretary soon promulgated regulations implementing this statutory command. *See* 43 Fed. Reg. 4832; 43 Fed. Reg. 31,868. To ensure rigorous enforcement of the Hyde Amendment, these regulations imposed extensive requirements on state agencies as well as other programs and projects that received funding from HEW. Among other things, the regulations required these entities to receive certifications from either one or two physicians, or documentation from a law enforcement agency or public health service, before they used federal funds to pay for an abortion within one of the Hyde Amendment's exceptions (depending on the exception), 42 C.F.R. §§ 50.304–50.307, 449.103–449.106 (1978); required the entities to maintain these certifications and documentation for three years in accordance with certain regulatory requirements and to safeguard the records against improper disclosure, *id.* §§ 50.309–50.310, 449.108–449.109; and denied federal funds to entities that failed to receive the certifications or documentation before paying for an abortion,

*id.* §§ 50.307, 449.106. *See also* 45 C.F.R. § 228.92 (1978) (incorporating requirements in 42 C.F.R. §§ 449.100–449.109 for another program). When this final requirement was criticized during a post-promulgation notice-and-comment period, HEW made clear its view that the requirement was "necessary to implement the statutory command that the provisions of [the Hyde Amendment] are to be rigorously enforced." 43 Fed. Reg. at 31,875. The agency elaborated that the Hyde Amendment would be violated if third parties spent federal funds advanced to them to make payments for abortions that did not fall within the statutory exceptions. *See id.* ("[The Hyde Amendment] prohibits the use of any funds appropriated under [the Act] to pay for abortions except for the three specified exceptions. Since States would be using Federal funds advanced to them to make payment for these abortions, the act would not be rigorously enforced unless the States had first received some evidence to confirm that the abortion was covered under one of those exceptions.").

These regulations and their surrounding commentary show that HEW—the agency then charged with administering the Hyde Amendment—believed that federal funds remain restricted even after they had been paid to third parties. *See also Proposed Regulations Pertaining to Federal Funding of Abortions*, 43 Op. Att'y Gen. at 111–12, 115 (approving the initial regulations as a reasonable interpretation of the statute). And HEW's successor agency, HHS, has maintained these requirements in largely the same form for the past forty years. *See, e.g.*, 42 C.F.R. §§ 50.301–50.310, 441.200–441.208; *see also Norwegian Nitrogen*, 288 U.S. at 315 ("[A]dministrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful.").[10] Thus, long-standing ad-

---

[10] Over the years, HHS has occasionally updated these regulations—either directly or through the issuance of guidance—to account for revisions in the Hyde Amendment itself. *See, e.g.*, Medicaid Program; Relations With Other Agencies, Miscellaneous Medicaid Definitions, Third Party Liability Quality Control, and Limitations on Federal Funds for Abortions, 52 Fed. Reg. 47,926, 49,731, 47,935 (Dec. 17, 1987) (removing certain exceptions from the Medicaid regulations); Letter for State Medicaid Directors from Sally K. Richardson, Director, Center for Medicaid and State Operations (Feb. 12, 1998), https://www.medicaid.gov/Federal-Policy-Guidance/downloads/smd021298.pdf (noting various changes in how the Medicaid regulations would be implemented in light of the 1997 revisions to the Hyde Amendment).

ministrative practice reinforces that the Hyde Amendment reaches expenditures of federal funds by third parties.

We therefore conclude that federal funding for student-aid programs subject to the Hyde Amendment remains so after it is paid to higher-education institutions for disbursement and may not be expended by those institutions in violation of the Hyde Amendment.[11]

## IV.

For these reasons, we conclude that the Hyde Amendment applies to all the funding for Pell Grants, SEOG, Service Grants, and Work-Study provided in the Department's annual appropriations legislation, but that no Hyde Amendment applies to the additional sources of federal funding for Pell Grants and Service Grants provided in other legislation. We

---

[11] In reaching this conclusion, we recognize that GAO has said that expenditures by recipients of federal funding "are not subject to all the same restrictions and limitations imposed on direct expenditures by the federal government" on the theory that such funds in the hands of third parties "largely lose their character and identity as federal funds." 2 *Federal Appropriations Law* at 10-68 to 10-69 (3d ed. 2006); *see also, e.g.*, *Anti-Strike Affidavit Requirements—Applicability to State Employees*, 28 Comp. Gen. 54, 56–57 (1948). As this Office has long noted, the Executive Branch is not bound by GAO decisions. *See, e.g.*, *Applicability of the Miscellaneous Receipts Act to an Arbitral Award of Legal Costs*, 42 Op. O.L.C. __, at *3 n.2 (Mar. 6, 2018); *Comptroller General's Authority to Relieve Disbursing and Certifying Officials From Liability*, 15 Op. O.L.C. 80, 82–84 (1991). And GAO's reasoning appears to be in tension with long-standing judicial precedent holding "that federal funds in the hands of a grantee remain the property of the federal government unless and until expended in accordance with the terms of the grant." *In re Joliet-Will County Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988) (citing *Buchanan v. Alexander*, 45 U.S. (4 How.) 20 (1846)); *see also* 2 *Federal Appropriations Law* at 10-72 to 10-76 (3d ed. 2006) (recognizing various contexts in which courts treat such funds as federal funds). In any event, we think that the federal student-aid context is distinguishable because of the specific regulatory requirements for the programs and because students, not higher-education institutions, are ordinarily the intended recipients of such funds. *Cf. Smith*, 596 F.2d at 664 (concluding that Work-Study funds held by a higher-education institution were "federal funds" because they were "in transit between their federal source and their intended recipient" and were "still subject to substantial federal controls," but suggesting that matters would be different if "an outright grant [was] paid over to the end recipient"). As a result, we need not decide whether the Hyde Amendment would apply to such funds after they are received by the end recipient, such as a student. *See also supra* note 8 (declining to decide whether the Hyde Amendment applies to federal student-aid funds after they are received by students or to federal funds used for institutional administrative expenses).

further conclude that federal funding subject to the Hyde Amendment remains so after it is paid to higher-education institutions for disbursement and that these institutions must therefore comply with the Hyde Amendment in expending such funds.

DEVIN A. DEBACKER
*Deputy Assistant Attorney General*
*Office of Legal Counsel*